UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL JOSEPH
O'CONNELL,

              Plaintiff,

v.

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.

_____/

Case No. 2:14-cv-13690

District Judge Sean F. Cox

Magistrate Judge Anthony P. Patti

**RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 17) AND TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 12)**

**I.**    **RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Defendant's motion for summary

judgment (DE 17), **DENY** Plaintiff's motion for summary judgment (DE 12), and

**AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

      Plaintiff, Daniel Joseph O'Connell, brings this action under 42 U.S.C. §§

405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social

Security ("Commissioner") denying his application for social security disability

insurance benefits. This matter is before the United States Magistrate Judge for a

Report and Recommendation on Plaintiff's motion for summary judgment (DE

12), the Commissioner's memorandum in opposition and cross motion for summary judgment (DE 17), and the administrative record (DE 8).

## A.    Background

Plaintiff protectively filed his application for disability insurance benefits on January 9, 2012, alleging that he has been disabled since February 1, 2011.  (R. at 140-46.)  Plaintiff's application was denied and he sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  ALJ Donald D'Amato held a hearing on April 4, 2013 and subsequently determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 21-67.)   On July 29, 2014, the Appeals Council denied Plaintiff's request for review.  (R. at 1-4.)  ALJ D'Amato's decision became the Commissioner's final decision.  Plaintiff then timely commenced the instant action.

## B.    Plaintiff's Medical History

### 1.    Plaintiff's Physical Impairments

Although it is unclear when Plaintiff first began his treatment with William Bowman, M.D., the first date of treatment in the record is July 22, 2010.  (R. at 213.)  Dr. Bowman noted that he discussed and recommended aerobic exercise and a low carbohydrate diet.  On March 3, 2011, Plaintiff presented with complaints of right-sided back pain that had been ongoing for two and half weeks.  (R. at 216.)  Dr. Bowman prescribed Medrol and Flexeril, and noted that Plaintiff would need

2

physical therapy if the medication did not work.  There is no evidence in the record that Plaintiff underwent physical therapy.  At his August 24, 2011 visit, Plaintiff complained of neck pain.  (R. at 220.)  Dr. Bowman diagnosed degenerative disc disease of the cervical spine and prescribed tramadol and stretching exercises. (Id.)  Plaintiff underwent an MRI of the cervical spine on September 19, 2011, which revealed multilevel degenerative disc disease with mild central canal stenosis.  (R. at 250-251.)  He was seen again for back pain on February 20, 2012 (R. at 455), March 7, 2012 (R. at 449) and June 13, 2012 (R. at 450).

On January 16, 2012, Dr. Bowman completed a Multiple Impairment Questionnaire.  (R. at 537-544.)  He indicated that Plaintiff was diagnosed with degenerative disc disease, bipolar, and ADHD, but that his prognosis was fair.  He described Plaintiff's shoulder pain as sharp and stabbing and noted that it was precipitated by sleeping, turning his head, and lifting more than 30 pounds.  (R. at 539.)  He rated Plaintiff's level of pain as ten out of ten and indicated that he could sit for one hour and stand or walk for four hours in an eight-hour workday.  In addition, he opined that Plaintiff could lift five to ten pounds frequently and ten to twenty pounds occasionally.  (R. at 540.)  In addition, he assessed marked impairments with Plaintiff's arms for grasping and reaching.  (R. at 541.)  He indicated that Plaintiff's pain frequently interfered with his attention and concentration, and that Plaintiff was accordingly capable only of low-stress work.

(R. at 542.)  Finally, he opined that Plaintiff would likely miss work more than three times per month.  (R. at 543.)   Dr. Bowman completed a second Multiple Impairment questionnaire on April 3, 2013 and the findings were unchanged.  (R. at 549-566.)

Plaintiff presented to the Pain Clinic of Michigan on September 22, 2011 with complaints of neck pain.  (R. at 268.)  He underwent two cervical facet joint blocks and a cervical epidural steroid injection on October 25, 2011, November 8, 2011, and December 22, 2011.  (R. at 274-79.)  He reported improvement after the injections.

### 2.    Plaintiff's Mental Impairments

On November 30, 2011, Plaintiff presented to Joel Young, M.D., a board certified psychiatrist, with complaints of depressed mood, poor sleep, and poor concentration.  (R. at 303.)  Dr. Young assessed a global assessment functioning score of 60 and prescribed Trazadone and therapy.  (R. at 305-306.)[1]   A December

---

[1]  The GAF scale was used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians selected a specific GAF score within the ten-point range by evaluating whether the individual was functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000) (DSM-IV-TR).  A GAF score of 51-60 was indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV-TR at 34.  However, "the most recent version of the DSM does not include a GAF rating for assessment

7, 2011 mental status examination revealed that Plaintiff was appropriately dressed, cooperative, engaged, pleasant, and stable, with normal motor functions and speech patterns, and a logical though process. (R. at 301.) On July 6, 2012, Kendra Niemi, MSN, RN, PMHNP-BC ("Nurse Niemi") indicated that Plaintiff's mood was worse, but that his treatment had been mildly helpful. His mental status examination was unchanged at this appointment and again on April 6, 2012. (R. at 366 and 372.)

Dr. Young completed a Psychiatric Impairment Questionnaire on February 29, 2012. (R. at 318-325.) He summarized Plaintiff's diagnoses as attention deficit and hyperactivity disorder ("ADHD"), generalized anxiety disorder, cocaine dependence, and bipolar disorder. (R. at 318.) He noted that Plaintiff had difficulty thinking or concentrating, poor memory, emotional lability, and obsessions, among other symptoms. (R. at 319.) He also opined that Plaintiff was moderately limited in the ability to carry out detailed instructions, and markedly limited in his ability to maintain concentration, work in proximity to others and get along with coworkers or peers. (R. at 320-22.)

Plaintiff began treating with Janet Heasely, D.O., on February 13, 2013. (R. at 527.) She assessed his GAF as 45, but noted that his memory and cognition were

---

of mental disorders." *Bryce v. Comm'r of Soc. Sec.*, No. 12-CV-14618, 2014 WL 1328277, at *10 (E.D. Mich. Mar. 28, 2014).

intact.[2]  (R. at 528.)  She completed a Psychiatric Impairment questionnaire on March 31, 2013.  (R. at 529-36.)  She diagnosed Plaintiff with bipolar, crack cocaine abuse in sustained remission, and attention deficit disorder.  (R. at 529.)  She opined that Plaintiff was markedly limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, sustain ordinary routine without supervision; work in coordination with others; complete a normal workweek; interact appropriately with the general public, accept instructions and respond to criticism from supervisors; get along with coworkers and peers; respond appropriately to changes in work settings; and set realistic goals.  (R. at 532-34.)

William J. Sophiea, MA, LLP, also completed a Psychiatric Impairment Questionnaire on March 4, 2013.  (R. at 519-526.) He opined that Plaintiff was markedly limited in his ability to remember locations and procedures, to understand and remember detailed instructions, to maintain attention and concentration, to perform activities within a schedule, to maintain regular attendance and be punctual, to complete a normal work week, to accept instructions and criticism from supervisors, to respond appropriately to changes in

_____

[2] A GAF score of 41-50 was indicative of serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

the work setting, and to travel to unfamiliar places.  (R. at 522-24.)  He also opined

that Plaintiff would be absent more than three times per month.  (R. at 526.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the April 4, 2013 administrative hearing, Plaintiff was a 48-year old high

school graduate.  (R. at 49.)  Plaintiff testified that since 1998, he worked as a

carpenter, truck driver, gas station attendant, and car wash detailer.  (R. at 54.)  he

indicated that he stopped working in a car detailing shop in 2011.  (R. at 50.)

Plaintiff testified to a variety of physical and mental impairments.  First, he

noted that he had been diagnosed with Bell's Palsy a year before, but that it had

improved.  (R. at 49-50.)  He also testified that he was a recovering addict who

formerly had problems with alcohol and cocaine.  (R. at 50.)  In addition, he

appeared at the hearing with a cane, and indicated that he used it to take pressure of

his shorter right leg.  (R. at 51.)

Plaintiff testified that his neck interferes with his functioning worse than all

of his other physical symptoms.  (R. at 51.)  He indicated that, from 1-10, the pain

level in his neck is consistently 5 with medication.  (R. at 51.)  Plaintiff testified

that he could sit for 20-25 minutes at a time until his lower back hurts, stand in

place for about 10 minutes, and could walk for 5-10 minutes.  (R. at 52.)  In

addition, he testified that he could lift a maximum of 15-20 pounds.  (R. at 53.)

Plaintiff testified that he was most comfortable when lying down and that he does that most of the day. (R. at 54.) He noted that he took two hour naps every day. (R. at 55.) Plaintiff testified that he underwent pain injections in 2011 and 2012, which helped him for about one week. (R. at 57.) He testified that he stopped receiving injections when his insurance ran out. (R. at 57.) Plaintiff noted that he took Hydrocodone, Flexeril, and ibuprofen for his back and neck pain. (R. at 51.)

Plaintiff testified that he has problems with headaches once per week, which was down from twice per week. (R. at 55.) He rated his headache pain as an 8 or 9 out of 10. (R. at 55.) Plaintiff indicated that he treated his headaches with ibuprofen and Vicodin. (R. at 56.) According to Plaintiff, the headaches last about 5 hours. (R. at 56.) Plaintiff also testified that he took Lorazepam to help with his sleep, but that he remained restless at night. (R. at 56.)

Plaintiff testified that he took Wellbutrin, Seroquel, Cymbalta, and Adderall for his mental conditions. (R. at 53.) He indicated that he did not like being around crowds and would prefer to be alone most of the time. (R. at 53.) Plaintiff noted that he had trouble with his memory and had to write himself notes in order to remember things like doctors' appointments. (R. at 58.) He further noted that he struggled with comprehension and concentration. (R. at 58.) Plaintiff testified that he also had issues with anger, which is why he avoids crowds. (R. at 59.) Plaintiff testified that he had bad days once per week when he felt so depressed

that he could not get out of bed.  (R. at 60.)  Plaintiff noted that he began mental

health therapy at the Rochester Center, then switched to the North Oakland Family

Counseling Center.  (R. at 58.)

### 2.    Vocational Expert Testimony

Ms. Castellano testified as the Vocational Expert ("VE") at the

administrative hearing.  (R. at 61-66.)  She classified Plaintiff's past relevant work

as carpenter (skilled and medium), truck driver (semiskilled and medium), gas

station attendant (semiskilled and medium), and car wash detailer (unskilled and

medium.)  (R. at 62.)

The ALJ asked the VE a series of hypotheticals.  First, he asked the VE to

determine if a hypothetical individual of Plaintiff's age, education, and past work

history with the following limitations could perform Plaintiff's past relevant work:

> [The hypothetical individual] [r]equires work that is unskilled with
> one, two or three-step instructions.  Occasionally in close proximity to
> coworkers and supervisors, meaning the individual can occasionally
> function as a member of a team.  Occasionally in direct contact with
> the public in a low-stress environment defined as having only
> occasional changes in the work setting.  Job responsibilities may be
> performed with the turning of the torso rather than the neck.  Can lift
> or carry five to ten pounds frequently, and 15 to 20 pounds
> occasionally.  Can stand and/or walk with normal breaks for a total of
> two hours in an eight-hour workday.  Can do so for only 15 minutes at
> one time.  Can sit with normal breaks for a total of six hours in an
> eight-hour workday.  Can do so for only 20 to 25 minutes at a time.
> Occasionally needs cane to ambulate.   Can perform pushing and
> pulling motions with the upper and lower extremities within the
> aforementioned weight restrictions for up to two-thirds of a workday.
> Can perform activities requiring bilateral manual dexterity for both

9

gross and fine manipulation with handling and reaching for up to two-thirds of a workday.  Needs to avoid hazards in the workplace such as moving machinery and unprotected heights.  Needs to be restricted to a relatively clean work environment, meaning stable temperatures, stable humidity and good ventilation that allows the individual to avoid concentrated exposure to dust, fumes, gasses, odors and other pulmonary irritants.  Can perform each of the following postural activities occasionally, climbing stairs with handrails, balancing, stooping, crouching, kneeling, crawling, but needs to avoid climbing ladders, scaffolds and ropes.

(R. at 62-63.)   Based on this hypothetical, the VE testified that Plaintiff could not perform his past relevant work, but identified several unskilled positions in both light and sedentary that had sit stand options.  At the light level, she testified that the hypothetical individual could perform as a production assembler, with 1500 jobs in southeast Michigan and in inspecting and sorting, with 1000 jobs in southeast Michigan.  (R. at 64-65.)  At the sedentary level, the VE testified that the hypothetical individual could perform packaging work, with 1000 jobs in southeast Michigan and in assembly jobs, with 1200 jobs in southeast Michigan.  (R. at 65.)

The ALJ then asked the VE if it would be work preclusive for the above hypothetical individual would be off task at least one hour per eight-hour day or would miss more than two days per month.  The VE testified that that much time off-task or absent would be work preclusive.  (R. at 65-66.)

10

## D.  THE ADMINISTRATIVE DECISION

On June 4, 2013, the ALJ issued his decision.  (R. at 21-39.)  At Step 1 of

the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in

substantially gainful activity since his alleged onset date of February 1, 2011.  (R.

at 23.)

At Step 2, the ALJ found that Plaintiff had the following severe

impairments: generalized anxiety disorder with history of panic attacks; major

depressive disorder, rule out bipolar disorder; ADHD, combined type; history of

cocaine and alcohol dependence/abuse; degenerative disc disease of the cervical

spine; degenerative changes of the lumbar spine at L5-S1, with a history of

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).
Although a dispositive finding at any step terminates the ALJ's review, *see Colvin
v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential
review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet
   or equal the criteria of an impairment set forth in the Commissioner's
   Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the
   claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and
   residual functional capacity, can the claimant perform other work
   available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th
Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

discectomy at L5-S1; chronic obstructive pulmonary disease ("COPD"); hyperlipidemia; headaches; history of Bell's Palsy, right side; new onset diabetes; obesity; and leg length discrepancy. (Id.)

At Step 3, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23-24.)

Prior to Step 4 of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC")[4] and determined that Plaintiff had the capacity to perform unskilled work with two or three step instructions, occasionally functioning as a member of a team in a low-stress environment, with all of the limitations opined in his first hypothetical. (R. at 26.) The ALJ concluded that Plaintiff could not perform his past relevant work. (R. at 37.)

At Step 5, the ALJ concluded that Plaintiff was capable of performing other jobs that exist in significant numbers in the national economy. (R. at 37-38.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 39.)

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

12

### E.   STANDARD OF REVIEW

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."). Furthermore, the claimant "has the ultimate burden to establish an entitlement to

benefits by proving the existence of a disability." *Moon v. Sullivan*, 923 F.2d

1175, 1181 (6th Cir. 1990).

Although the substantial evidence standard is deferential, it is not trivial.

The Court must "'take into account whatever in the record fairly detracts from

[the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384,

395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487

(1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this

Court defers to that finding 'even if there is substantial evidence in the record that

would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*,

581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997));

*see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security

as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting

*Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## F. ANALYSIS

In his motion for summary judgment, Plaintiff asserts two major statements

of error. First, he contends that the ALJ erred in his RFC assessment because he

14

failed to properly weigh the opinion evidence.  Second, he contends that the ALJ

inappropriately discounted Plaintiff's credibility.  The Commissioner opposes

Plaintiff's motion, asserting that she is entitled to a grant of summary judgment

because substantial evidence supports the ALJ's conclusions.  I will address each

argument in turn.

### 1.    Weighing of the Opinion Evidence

Plaintiff's RFC is "the most [he or she] can still do despite the physical and

mental limitations resulting from [his or] her impairments."  *Poe v. Comm'r of

Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); s*ee also* 20 C.F.R. §§

404.1545(a), 416.945(a).  The determination of Plaintiff's RFC is an issue reserved

to the Commissioner and must be supported by substantial evidence.  20 C.F.R. §§

404.1527(3), 416.927(e).  "'ALJs must not succumb to the temptation to play

doctor and make their own independent medical findings.'"  *Simpson*, 344 F.

App'x at 194 (6th Cir. 2009) (quoting *Rohan*, 98 F.3d at  970).

Pursuant to Social Security Rule 96-8p, the  RFC assessment must include:

> [A] narrative discussion describing how the evidence supports each
> conclusion, citing specific medical facts (e.g., laboratory findings) and
> nonmedical  evidence  (e.g.,  daily  activities,  observations).      In
> assessing RFC, the adjudicator must discuss the individual's ability to
> perform sustained work activities in an ordinary work setting on a
> regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or
> an equivalent work schedule), and describe the maximum amount of
> each work-related activity the individual can perform based on the
> evidence available  in  the  case  record. The  adjudicator  must  also

> explain how any material inconsistencies or ambiguities in the
> evidence in the case record were considered and resolved.

S.S.R. 96-8-, 1996 WL 374184, at *6-7. "Although SSR 96–8p requires a

'function-by-function evaluation' to determine a claimant's RFC, case law does

not require the ALJ to discuss those capacities for which no limitation is alleged."

*Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002).  Instead, the

ALJ '"need only articulate how the evidence in the record supports the RFC

determination, discuss the claimant's ability to perform sustained work-related

activities, and explain the resolution of any inconsistencies in the record."' *Id.*

(quoting *Bencivengo v. Comm'r of Soc. Sec.,* No. 00–1995,  251 F.3d 153, slip op.

at 5 (3d Cir. Dec. 19, 2000).

Here, Plaintiff asserts that the ALJ erred in his RFC assessment by

improperly weighing the medical evidence.  Specifically, Plaintiff takes issue with

the ALJ's assignment of limited weight to the opinions of Dr. Bowman, some

weight to the opinions of Dr. Young, and limited weight to the opinions of Dr.

Healey.

### a.      Plaintiff's Treating Physician, Dr. Bowman

The ALJ must consider all medical opinions that he or she receives in

evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The regulations define

medical opinions as "statements from physicians . . . that reflect judgments about

the nature and severity of your impairment(s), including your symptoms, diagnosis

and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). "Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 CFR § 404.1527(e)(2)(i). The ALJ must, however, "consider findings and other opinions" of State Agency medical or psychological consultants. Id.

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(d)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). To qualify as a treating source, the physician must have an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Wilson*, 378 F.3d at 544 (discussing 20 C.F.R. § 404.1527).  Furthermore, an ALJ

must "always give good reasons in [the ALJ's] notice of determination or decision

for the weight [the ALJ] give[s] [the claimant's] treating source's opinion."  20

C.F.R. § 416.927(d)(2).  Accordingly, the ALJ's reasoning "must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave

to the treating source's medical opinion and the reasons for that weight."  *Friend v.*

*Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010)

(internal quotation omitted).  The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases," particularly in situations
> where a claimant knows that his physician has deemed him disabled
> and therefore "might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied."  *Snell v. Apfel*, 177 F.3d 128, 134 (2d
> Cir.1999). The requirement also ensures that the ALJ applies the
> treating physician rule and permits meaningful review of the ALJ's
> application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33
> (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.

Here, the ALJ assigned limited weight to Dr. Bowman's opinions.  First, he

noted that Dr. Bowman's statements that Plaintiff is disabled or unable to work

were not medical opinions, but are dispositive findings reserved to the

Commissioner.  Second, he noted that the "extreme limitations" opined by Dr.

Bowman, including the need for a 30-minute break every hour and to preclude bilateral reaching were not supported by objective evidence.  The ALJ also supported his conclusion by relying on an inconsistency between Dr. Bowman's opinion that Plaintiff could sit for only one hour during an eight-hour workday, and Plaintiff's testimony that he could sit for 25 minutes at a time.  Finally, the ALJ pointed out inconsistencies in Dr. Bowman's own statements, which sometimes indicate that Plaintiff can lift up to 20 pounds and other times indicate that he can only lift up to ten pounds.

Plaintiff asserts that the ALJ's treatment of Dr. Bowman's opinions was incorrect because his opinions were supported by objective medical evidence, namely a September 19, 2011 MRI of his cervical spine, as well as clinical examinations documenting tenderness.  He posits that Dr. Bowman's inconsistency on whether Plaintiff can lift ten or 20 pounds is irrelevant, and that Plaintiff's ability to sit for 25 minutes at a time does not mean he could sit for six hours in an eight-hour workday.

The Commissioner counters that the evidence that Plaintiff believes supports Dr. Bowman's opinions predates the treatment Plaintiff received for his pain in September 2011.  Further, she contends that the records to which Plaintiff cites do not support the extreme limitations opined by Dr. Bowman.  Finally, Defendant points out that the ALJ did not indicate that Plaintiff could sit continuously for six

hours, and limited Plaintiff to sitting for twenty to twenty-five minutes at a time in his RFC.

Although Plaintiff takes issue with the ALJ's discounting of Dr. Bowman's opinion, and points to some evidence in the record indicating that Plaintiff had degenerative disc disease, the ALJ's conclusions are supported by substantial evidence. First, the ALJ points to evidence in the record that demonstrates that Plaintiff's conditions are less severe than those opined by Dr. Bowman. For example, as the Commissioner notes, the only imaging of his lumbar spine in the record was a 2010 x-ray that revealed a normal lumbar spine, and a September 19, 2011 MRI that showed only mild or moderate changes. (R. at 251-52, and 257.) Although Plaintiff disagrees about the results of the 2011 x-ray, the Court cannot re-weigh the evidence in his favor. *See VanSingel v. Comm'r of Soc. Sec.*, 26 F. App'x 488, 489 (6th Cir. 2002) ("If supported by substantial evidence, the Commissioner's decision must be affirmed, even if [the reviewing court] would have arrived at a different result.") (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir.1983)). Such an analysis would be incompatible with the 'substantial evidence' standard of review. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (concluding that "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."). Here, the ALJ followed the treating physician rule and provided appropriate

20

reasons for discounting Dr. Bowman's opinions.  I see no reason to disturb that finding.

### b.    Plaintiff's Treating Psychiatrists, Drs. Healey and Young, and Nurse Niemi

Drs. Healey and Young, Plaintiff's treating psychiatrists, opined that Plaintiff is easily overwhelmed, has difficulty thinking or concentrating, suffers from obsessions or compulsions and social withdrawal, and has poor memory.  (R. at 319 and 530.)  Plaintiff argues that Young and Healey's opinions are supported by extensive evidence.  Specifically, he asserts that the ALJ placed too much emphasis on his relatively high GAF scores and points out that Plaintiff's mental status abnormalities are confirmed by his treatment records.  As examples, he points to his December 7, 2011 session with Judith Redmond (R. at 301), his December 19, 2011 (R. at 296), April 6, 2012, and July 6, 2012 (R. at 366) sessions with Nurse Niemi, and his February 13, 2013 session with Dr. Heasley (R. at 528.)  However, a review of the "mental status" portion of these records shows that Plaintiff was appropriately dressed, well-groomed, and pleasant (R. at 296), alert and oriented, with memory and cognition intact (R. at 528), with normal speech pattern and thought processes and appropriate judgment (R. at 301, 366, and 372), and a notation that treatment was "mildly helpful" (R. at 366).

21

### i.       Dr. Healey

With respect to Dr. Healey's opinion, the ALJ noted that it was completed after only two sessions with Plaintiff.  (R. at 35.)   As such, its weight was properly discounted.  *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); *see also Wurster v. Comm'r of Soc. Sec.*, No. 1:12-CV-1149, 2014 WL 1345403, at *2 (W.D. Mich. Mar. 31, 2014) (concluding that the ALJ properly discounted the opinion of a treating physician where the claimant and the physician had a "very brief treatment relationship.").   The ALJ also points to the mental status examinations discussed above, noting that Plaintiff was found to be polite, cooperative, oriented, neatly dressed, with logical thoughts and intact memory and cognition.  As a result, the ALJ concluded that Dr. Healey's opinions were based on Plaintiff's subjective complaints, which he had already concluded were not fully credible.  (Id.)

### ii.       Dr. Young and Nurse Niemi

Similarly, the ALJ pointed out that the objective findings of Dr. Young and Nurse Niemi do not support the limitations they opined, noting that most of the status examinations were normal.  (R. at 34.)  Nevertheless, he gave some weight

22

to their opinion, and accordingly limited Plaintiff to unskilled work with no more than occasional changes in work setting.  (Id.)

When assessing the opinions of Dr. Young and Nurse Niemi, the ALJ briefly discussed Plaintiff's relatively high GAF scores (ranging from 45-60).  As Plaintiff points out, the Sixth Circuit has held that a GAF score "is not dispositive of anything in and of itself, but rather only significant to the extent that it elucidates an individual's underlying mental issues."  *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011).  Here, the ALJ did not use Plaintiff's GAF scores as dispositive of his mental health status.  Instead, he noted that *in addition to the other evidence in the record* of Plaintiff's relatively normal mental health, the high GAF scores assessed by Dr. Young and Nurse Niemi further contradicted their opinion that Plaintiff was very restricted.  As such, the GAF scores were only (and permissibly) used to "elucidate" his underlying mental illness.  The Undersigned finds no error in the ALJ's weighing of the opinions of Plaintiff's treating psychiatrists.

### c.      Plaintiff's Treating Therapist, Mr. Sophiea

Plaintiff asserts that the ALJ erred in failing to discuss Mr. Sophiea's opinion that Plaintiff had poor memory, social withdrawal, anxiety, hostility, and difficulty thinking or concentrating.  (R. at 519-526.)  Defendant concedes that the ALJ likely should have discussed Mr. Sophiea's opinion, but notes that the error

was harmless because Mr. Sophiea's opinion largely mirrored the opinions of Drs. Heasley and Young, to which the ALJ gave limited weight.

The Undersigned agrees that any failure to explicitly discuss Mr. Sophiea's opinion was an error. However, "'an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'" *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467-68 (6th Cir. 2004) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Furthermore, Mr. Sophiea, a Limited Licensed Psychologist, is not an acceptable medical source whose opinion is entitled to deference pursuant to 20 C.F.R. § 404.1513(a). *See also Hogston v. Comm'r of Soc. Sec.*, No. 12-12626, 2013 WL 5423781, at *9-10 (E.D. Mich. Sept. 26, 2013) (collecting cases that declined to analyze LLPs as acceptable medical sources and instead treated them as "other sources").

Defendant's argument is persuasive. Mr. Sophiea's opinion was not entitled to the same level of deference as an acceptable medical source, such as Drs. Heasley and Young. Furthermore, his opinion largely mirrored that of Drs. Heasely and Young. As addressed above, substantial evidence adequately supports the ALJ's decision to discount the opinions of Drs. Heasely and Young, and the same analysis would apply to Mr. Sophiea's opinion. The opinion itself does not add any objective medical evidence to indicate that Plaintiff's mental health issues

caused moderate or marked restrictions.  Accordingly, the ALJ's failure to

explicitly discuss Mr. Sophiea's opinion amounted to no more than harmless error.

*See, e.g., Dykes ex rel. Brymer*, 112 F. App'x at 468 (noting that "if the refusal to

even acknowledge the opinion of a treating physician was harmless error . . . then

the ALJ's failure in the present case to discuss thoroughly the opinion of a

consultative examiner does not warrant reversal.").

### d.   Dr. Pinaire's Opinion

Finally, the ALJ did not err by affording greater weight to State Agency

medical consultant Dr. Pinaire's opinion than that of his treating psychiatrists.  To

the extent Plaintiff makes such an argument, it is misplaced.  The ALJ was entitled

to rely on the opinion of a non-examining State Agency physician.  *McGrew v.*

*Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).  Were this not the case,

and if ALJs were utterly bound to rubber-stamp the opinions of treating sources

regardless of the § 404.1527(c) considerations, one would have to ask rhetorically

what the point of obtaining a consulting opinion could possibly be.

In addition, as addressed above, the severe restrictions opined by Plaintiff's

treating psychiatrists were not supported by substantial evidence in the record and

therefore not entitled to controlling weight.  The ALJ's decision to afford more

weight to the opinion of a State Agency consultant is supported by substantial

evidence in the record.

### 2.    The ALJ's Assessment of Plaintiff's Credibility

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue,* 263 F. App'x 469, 475 (6th Cir. 2008); *see also Beavers v. Sec'y of Health, Ed., and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) ("The opportunity to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly."). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 469, 475 (6th Cir. 2007). Nevertheless, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters v. Comm'r Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters,* 127 F.3d at 531; *see also Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011) ("Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."). When assessing an individual's credibility, "the

ALJ must [first] determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011). The ALJ made this finding here, concluding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. at 56.)

Upon making such a finding, the ALJ must next "consider the entire case record" to "evaluate the intensity, persistence, and functional limitations of the symptoms considering objective medical evidence." 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p. A non-exhaustive list of relevant factors to be considered by the ALJ include: 1) the claimant's daily activities; 2) location, duration, frequency, and intensity of pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medication; 5) treatment, other than medication; 6) any measures the claimant uses or has used to relieve his or her pain or other symptoms; and 7) other factors concerning functional limitations and restrictions. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 474 (6th Cir. 2014); 20 C.F.R. § 404.1529(c)(1-3); Soc. Sec. Rul. 96-7p; *see also Ewing v. Astrue*, No. 10-cv-1792, 2011 WL 3843692, at *9 (N.D. Ohio, Aug 12, 2011) ("Social Security Ruling 96-7p requires such factors to be *considered*, not *discussed* . . . .") (emphasis in original) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

27

508 (6th Cir. 2006)).  In his or her opinion, the ALJ must "provide a sufficiently

specific explanation for his [or her] credibility determination so that it is clear to

the individual and any subsequent reviewers the weight given to the individual's

statements and the reasons for that weight."  *Malcolm v. Comm'r of Soc. Sec.*, No.

13-15188, 2015 WL 1439711, at *7 (E.D. Mich. Mar. 27, 2015) (citing *Soc. Sec.

Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1997)).

Here, the ALJ concluded that although Plaintiff's medically determinable

impairments could reasonably be expected to cause the symptoms he alleged, his

statements concerning the intensity, persistence, and limiting effects of the

symptoms were not entirely credible.  (R. at 27.)  To support this conclusion, the

ALJ pointed to a number of inconsistencies between Plaintiff's testimony and the

medical evidence.  For example, the ALJ concluded that Plaintiff's relatively

normal MRI results and mental status examinations conflicted with his complaints

of disabling pain and depression.[5]  (R. at 27-30.)  The ALJ also took note of the

inconsistency between Plaintiff's testimony about when he stopped working, and

the medical evidence that demonstrated he actually worked an additional ten

months longer.  (R. at 31.)  Similarly, he noted the inconsistency between

Plaintiff's testimony that he had not used alcohol or cocaine for ten years, despite

_____

[5] The ALJ also pointed out the inconsistency between Plaintiff's testimony that he
suffered from debilitating headaches and the fact that he rarely complained of
those symptoms to his doctors, but Plaintiff does not challenge this basis on which
to discount his credibility.  (R. at 27.)

28

evidence in the record that he had relapsed in 2010 and 2011.  (R. at 31.)
Additionally, the ALJ determined that Plaintiff's ability to control his neck pain
with relatively conservative treatment undercut his allegations of disabling pain.
(R. at 30.)  The ALJ also looked at Plaintiff's reported activities of daily living,
and noted that his statements about his ability to engage in personal care, care for
family pets, prepare simple meals, do housework, shop, and pay bills were
inconsistent with his allegations of disability.  (R. at 31.) Finally, the ALJ indicated
that Plaintiff's receipt of unemployment benefits, which required him to affirm that
he was able to work, weighed against his credibility in this case.  (R. at 32.)

Plaintiff contends that the ALJ erred in his determination that Plaintiff was
less than credible for the following five reasons: 1) objective medical evidence
supports Plaintiff's subjective statements; 2) the ALJ put too much emphasis on
Plaintiff's ability to engage in activities of daily living; 3) the ALJ should not have
relied on his inconsistent statements about his date of last work and drug/alcohol
use; 4) the ALJ improperly considered his receipt of unemployment benefits; and
5) the ALJ erred by relying on Plaintiff's conservative treatment without
acknowledgment that he lacked insurance.

### a.    Inconsistency with Objective Medical Evidence

First, he asserts that objective medical evidence, specifically, the
aforementioned MRI findings and mental status examinations, support his

subjective statements about the severity of his condition.  As addressed above, I

disagree that the MRI and mental status evidence supports a greater level of

impairment than that assessed by the ALJ, and at any rate, the ALJ was well within

his authority to make the assessment he did.  Accordingly, the ALJ did not err in

assessing Plaintiff as less than credible where his subjective statements suggested a

higher level of impairment than the evidence in the record.  *See Newsome v.

Sullivan*, 897 F.2d 529, at *2 (6th Cir. 1990) (in weighing contradictory

unsupported subjective statements of pain, the objective evidence is controlling).

### b.    Daily Activities

Second, Plaintiff asserts that the ALJ put too much emphasis on his ability to

engage in some activities of daily living when assessing whether or not he was

disabled.  Defendant counters that Plaintiff overstates the general rule that the

ability to perform some activities of daily living does not mean that a claimant is

not disabled.  Instead, Defendant argues that an ALJ may consider activities of

daily living when assessing credibility, but may not focus on those activities as the

sole or main reason behind the negative credibility finding.  *See Warner v. Comm'r

of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("The administrative law judge

justifiably considered [claimant's] ability to conduct daily life activities in the face

of his claim of disabling pain.").

30

The ALJ's consideration of Plaintiff's activities of daily living was not itself in error. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (concluding that the ALJ properly determined that the claimant's "subjective complaints were not credible in light of her ability to perform other tasks" including walking around her yard, riding a bicycle, going to church, going on vacation, cooking, vacuuming, and making beds). Additionally, as noted above, Plaintiff's activities of daily living are not the ALJ's only rationale for discounting Plaintiff's allegations of work-preclusive limitations. *See Boley v. Comm'r of Soc. Sec.*, No.. 11-cv-15707, 2012 WL 7748910, at *13 (E.D. Mich. Nov. 28, 2012) *report and recommendation adopted*, No. 11-CV-15707, 2013 WL 1090531 (E.D. Mich. Mar. 15, 2013) (concluding that, while "minimal activities of daily living do not, by themselves, show that a claimant can perform the demands of full-time work," such a consideration *in combination with other relevant factors* was proper to discount Plaintiff's credibility.).

Here, the ALJ provided an extensive credibility analysis, in addition to his consideration of Plaintiff's reported activities of daily living. Specifically, the ALJ considered the objective medical evidence in the record and discrepancies in Plaintiff's testimony. As an example, the ALJ addressed Plaintiff's testimony that he napped during the day, and pointed out that Plaintiff had previously blamed this on "not working or doing anything during the day" and not on the severity of his

symptoms.  (R. at 31.)  *See Allen v. Comm'r of Soc. Sec.*, No. 13-cv-14106, 2015 WL 574910, at *5 (E.D. Mich. Feb. 11, 2015) (concluding that the ALJ did not put undue weight on the claimant's activities of daily living but instead used them to point out inconsistencies between the claimant's testimony and the record).

Furthermore, the ALJ expressly stated that he complied with Social Security Rule 96-7p, which requires him to consider a non-exhaustive list of factors in determining credibility.  (R. at 26.)  There is no indication that he failed to do so. *See, e.g.*, *Malcolm*, 2015 WL 1439711 at *8 (concluding that, in light of the Court's deferential approach to credibility assessments, the ALJ's express statement of compliance was persuasive).  Social Security Rule 96-7p, in accordance with 20 C.F.R. § 404.1529, requires the ALJ to consider the claimant's activities of daily living.  As addressed above, the ALJ did just that, and included such consideration in his credibility determination.  He certainly cannot be *faulted* for complying with the regulation.  Accordingly, Plaintiff has not demonstrated that the ALJ erred by considering his activities of daily living when assessing his credibility.

### c.      Dates of Last Work, Alcohol and Narcotics Use

Third, Plaintiff takes issue with the ALJ's consideration of his inconsistent statements related to his last date of work and the last time he used alcohol and cocaine.  Specifically, the ALJ pointed out that Plaintiff testified at the hearing that

he had not worked since February 2011, but his treatment records state that he was working (at least part-time) in December 2011.  (R. at 31, 263.)  In addition, Plaintiff testified that he had not used alcohol and cocaine for about 10 years, but the medical evidence reveals a "two-day binge" in 2010 (R. at 300), along with a cocaine relapse in 2011 (R. at 215).  Plaintiff asserts that, because the ALJ failed to find that he engaged in substantial gainful activity after his onset date and did not find any substance abuse during the period at issue, the ALJ should not have used the inconsistencies as part of his credibility analysis.

This argument is unavailing.  As to Plaintiff's date last worked, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity after his onset date.  Substantial gainful activity is a consideration based on the amount the claimant earns from his or her work activity.  20 C.F.R. § 404.1574.  It was therefore not a contradiction for the ALJ to determine that Plaintiff did not earn a sufficient amount after his date of onset in order to constitute substantial gainful activity, and to also use Plaintiff's conflicting statements about when he stopped working in order to discount his credibility.  Similarly, the ALJ did not err in considering the inconsistency between Plaintiff's testimony that he had not used drugs for ten years, and the objective medical evidence to the contrary.  .  As noted above, the ALJ is entitled to weigh conflicting testimony when making his or her

33

credibility assessment.  *See Allen*, 2015 WL 574910 at *5.  Plaintiff has not

demonstrated that the ALJ erred in this respect.

### d.      Receipt of Unemployment Benefits

Fourth, Plaintiff argues that the ALJ should not have considered Plaintiff's

receipt of unemployment benefits when assessing Plaintiff's credibility.  He points

to Memorandum 10-1258 from Chief Administrative Law Judge Frank Cristaudo,

which explains that a claimant's statement that he or she can work for the purposes

of obtaining unemployment benefits *does not preclude* a finding of disability.

However, Defendant points to case law in this District holding that the

memorandum "does not state that ALJ's are not permitted *to discount* a claimant's

credibility on the basis he is collecting unemployment benefits; rather, it should be

considered with other evidence in determining disability."  *Smith v. Astrue*, No. 10-

12648, 2011 WL 3897752, at *5 (E.D. Mich. July 6, 2011) (emphasis added); *see*

*also Workman v. Comm'r of Social Sec.,* 105 F. App'x 794, 801, 2004 WL

1745782, *7 (6th Cir.2004) (citing *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th

Cir.1983), upholding an ALJ's credibility determination on the basis that

"[a]pplications for unemployment and disability benefits are inherently

inconsistent"); *Bowden v. Commissioner Social Sec.,* 173 F. 3d 854, 1999 WL

98378, *7 (6th Cir.1999) (the claimant "offers no reasonable explanation of how a

person can claim disability benefits under the guise of being unable to work, and

34

yet file an application for unemployment benefits claiming that she is ready and willing to work").

I entirely agree with the ALJ's conclusion that Plaintiff's receipt of unemployment benefits, which required him to represent himself as being able to work, bears negatively on his credibility in this instance. Indeed, Plaintiff appears to be "blowing hot and cold as the occasion demands [or] having one's cake and eating it too" in his attempts to collect benefits from two government agencies for conflicting reasons. *See Reynolds v. CIR*, 862 F.2d 469, 472 (6th Cir. 1988) (internal citations omitted)). Defendant's argument is persuasive and Plaintiff does not reconcile the holding in *Smith* (or any of the other cases in this District with similar holdings) with his argument that the ALJ erred by considering Plaintiff's receipt of unemployment benefits as *one of the bases* for discounting his credibility.

### e.    Loss of Insurance Versus Conservative Treatment

Finally, Plaintiff relies on S.S.R. 82-59 (1982 WL 31384), to argue that the ALJ should have considered Plaintiff's inability to afford treatment, rather than assuming his conservative treatment was because his pain was not severe. "The Sixth Circuit recognizes that a claimant's failure to follow prescribed treatment is evidence supporting an ALJ's factual finding that the claimant's testimony was not fully credible." *Lemle v. Comm'r of Soc. Sec.*, No. Civ.A. 11-10295, 2012 WL

1060111, at *9 (E.D. Mich. Jan. 27, 2012) *report and recommendation adopted*,

No. 11-10295, 2012 WL 1069787 (E.D. Mich. Mar. 29, 2012) (citing *Sias v. Sec'y*

*of Health & Hum. Servs.*, 861 F.2d 475, 480 (6th Cir. 1988)); *see also* S.S.R. 96-

7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less

credible if . . . the medical reports or records show that the individual is not

following the treatment as prescribed and there are no good reasons for this

failure.").  Pursuant to Social Security Ruling 96-7P, however, an ALJ may not

draw:

> any inferences about an individual's symptoms and their functional
> effects from a failure to seek or pursue regular medical treatment
> without first considering any explanations that the individual may
> provide, or other information in the case record, that may explain
> infrequent or irregular medical visits or failure to seek medical
> treatment.

S.S.R. 96-7P.  For example, the ALJ should consider the claimant's explanation

where the individual "may be unable to afford treatment and may not have access

to free or low-cost medical services."  *Id.*  Similarly, Social Security Ruling 82-59

provides that inability to afford treatment is a justifiable cause for failing to follow

prescribed treatment.  S.S.R. 82-59; *see also McKnight v. Sullivan*, 927 F.2d 241,

242 (6th Cir. 1990) (agreeing with the conclusion that a "condition that is disabling

in fact continues to be disabling in law," when the claimant "cannot afford

prescribed treatment or medicine and can find no way to obtain it." (internal

quotations omitted)).

Here, during the hearing, Plaintiff testified that he stopped receiving pain injections when his insurance ran out in the beginning of 2012.  (R. at 57.)  The ALJ then noted in his decision that Plaintiff "underwent one more set of facet blocks and epidural injections on December 22, 2011" but "did not see his pain management specialist again or undergo any other further procedures."  (R. at 30.) Nor did he seek out another specialist.  Instead, he "simply had Dr. Bowman refill his medications," which suggested to the ALJ that his neck pain had been under fair control with conservative treatment.

Defendant concedes that an ALJ may not draw negative inferences from Plaintiff's failure to seek or pursue treatment without first considering evidence explaining the lack of treatment.  According to Defendant, however, the ALJ did not draw a negative inference from Plaintiff's failure to follow prescribed treatment, but instead from the conservative nature of the treatment.  Defendant relies on an unpublished Eastern District of North Carolina case to support her proposition that the Ruling "does not prohibit an ALJ from considering Claimant's election of more conservative treatment when assessing his credibility regarding the severity of his symptoms."  *Farrior v. Astrue*, No. 7:10-164, 2011 WL 3157150, at *5 (E.D.N.C. July 26, 2011).

Although the *Farrior* case is not binding on this Court, its reasoning is sufficiently persuasive, and tracks with the Sixth Circuit's holdings related to the

ALJ's consideration of conservative treatment as a basis for discounting
credibility. *See, e.g., Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir.
2015) (concluding that the ALJ "reasonably discounted [the treating physician's]
medical opinion on the basis that it conflicted with other substantial evidence in the
record," including his own treatment notes which "generally showed that [the
claimant] was receiving conservative treatment . . . .").

Here, the ALJ discussed several aspects of Plaintiff's credibility with respect
to his pain injections. First, he took note of Plaintiff's testimony that the pain relief
afforded by the injections lasted only a week. (R. at 57.) The ALJ compared this
with the medical evidence in the record, in which Plaintiff self-reported that the
injections relieved his pain, to a tolerable degree, for at least a month. (R. at 30,
261.) Second, the ALJ did not indicate that he was discounting Plaintiff's
credibility because he failed to undergo additional facet block and epidural
injections, the procedures presumably prohibited by Plaintiff's insurance; rather, he
noted:

> The claimant underwent one more set of facet blocks and epidural
> injections on December 22, 2011. Thereafter, he did not see his pain
> management specialist again or undergo any further procedures. He
> also did not resume treatment with any other specialist, such as a
> neurologist or orthopedic spine surgeon. He simply had Dr. Bowman
> refill his medications, including Vicodin and Ibuprofen 800mg. This
> suggests that his neck pain has been under fair control with merely
> conservative treatment, which itself undercuts his allegations of
> disabling pain.

(R. at 30, internal citations omitted.)  The single sentence in Plaintiff's brief on this issue does not demonstrate that his insurance situation precluded him from taking *any of the actions* described by the ALJ.  Neither does his testimony, which only stated that the "insurance ran out" and thus precluded further "*pain injections*."  (R. at 52, emphasis added.)  Nor does it, as the Ruling mandates, demonstrate that all possible resources, such as clinics or charitable and public assistance agencies, were explored.  Moreover, it is the Plaintiff's burden before Step 4 to show that his insurance situation precluded more aggressive treatment *of any sort* in this instance, and he has failed to develop a record that supports that conclusion.  At best, he has only shown that a single form of treatment was prohibited by insurance.

I recognize that this particular issue is a close one.  However, in the scheme of the ALJ's entire analysis, his consideration of the conservative nature of Plaintiff's treatment as one among many bases to discount his credibility, is without error; or, alternatively, it was a harmless error, because Plaintiff has not demonstrated that, had the ALJ considered his lack of insurance on this one basis for discounting his credibility, there could have been a different result.  *See Shinseki, Secretary of Veterans Affairs v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").  Based on the foregoing, the ALJ has

provided a sufficiently specific explanation for his credibility determination, and Plaintiff has failed to demonstrate that the adverse-credibility finding was not supported by substantial evidence.

### G.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment, **GRANT** Defendant's motion for summary judgment, and **AFFIRM** the Commissioner of Social Security's decision.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 932 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: November 25, 2015   s/Anthony P. Patti
            Anthony P. Patti
            UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of this document was sent was sent to parties of record on November 25, 2015, electronically and/or by U.S. Mail.

            s/Michael Williams
            Case Manager for the
            Honorable Anthony P. Patti